## A05A0163. PROFESSIONAL STANDARDS COMMISSION v. ALBERSON.
### (614 SE2d 132)

BERNES, Judge.

The Professional Standards Commission of the State of Georgia ("PSC") appeals from the order entered by the Superior Court of Turner County reversing the PSC's final decision suspending the educator certificate of Superintendent Jimmy Alberson for one year. The PSC suspended Superintendent Alberson's certificate after concluding that his decision to brandish a firearm while threatening a Georgia Department of Transportation ("DOT") flagman violated Interim Ethics Rule 505-2-.03 (1) (n) and (o) (1999), under which a school official may have his educator certificate suspended for "[p]ersonal conduct ... detrimental to the ... morals of pupils" or for "[a]ny other good and sufficient cause," respectively.[1] On appeal, the PSC contends that the superior court erred by holding that there was no evidence in the administrative record supporting the conclusion that Superintendent Alberson violated Interim Ethics Rule 505-2-.03 (1) (n) and (o), and by concluding that Interim Ethics Rule 505-2-.03 (1) (o) was unconstitutionally vague. We agree with the PSC and therefore reverse.

---

[1] Both parties to this appeal agree that we should apply the PSC ethics rules that were in effect from July 1, 1998, to July 1, 1999, because the incident at issue occurred on February 12, 1999. We will refer to the 1999 version of the ethics rules throughout this opinion as the "Interim Ethics Rules." The current "Code of Ethics for Educators" can be found at Ga. Comp. R. & Regs. r. 505-6-.01.

On the morning of February 12, 1999, Jimmy Alberson, superintendent of the Turner County School System, had two confrontations with Eddie B. Tookes, Jr. while Tookes was working as a flagman at a DOT work site on Highway 32 in Turner County. It is undisputed that during at least one of these two confrontations, Superintendent Alberson brandished a firearm in front of Mr. Tookes.

After investigating the incident, the PSC found probable cause that Superintendent Alberson had violated Interim Ethics Rule 505-2-.03 (1) (n) and (o) and that his educator certificate should be revoked. Interim Ethics Rule 505-2-.03 (1) (n) permitted suspension or revocation of an educator's certificate based on a finding of "[p]ersonal conduct that seriously reduces the certificate, license or permit holder's effectiveness in his or her employment position or conduct detrimental to the health, welfare, discipline or morals of pupils." Ga. Comp. R. & Regs. r. 505-2-.03 (1) (n) (1999). Interim Ethics Rule 505-2-.03 (1) (o) permitted suspension or revocation for "[a]ny other good and sufficient cause." Ga. Comp. R. & Regs. r. 505-2-.03 (1) (o) (1999).

Following the PSC's finding of probable cause, Superintendent Alberson requested a full evidentiary hearing before an administrative law judge ("ALJ") with the Office of State Administrative Hearings. An ALJ conducted the requested hearing on June 27, 2002, and August 23, 2002. Thereafter, the ALJ issued her initial decision in which she made specific findings of fact regarding the February 1999 incident:

> Respondent [Alberson] holds a certificate to teach in the state of Georgia and has at all times relevant to this matter. He has been the Superintendent of Turner County Schools for the last 13 years. Prior to being elected to the superintendent position, Respondent was Chief of Police.
>
> On February 12, 1999, Respondent and the assistant superintendent, Kip Stevens, drove out to Otis and Ruby Odom's house to monitor tree cutting on Mr. Odom's property. Respondent is a close personal friend of the elderly Odoms and provides them assistance.
>
> Once at the Odoms' house, Otis Odom communicated to Respondent that he believed one of the [DOT] workers working near his house was the same individual who had burglarized the Odoms' home. This individual was asking Mr. Odom to bring money with him when he returned to the DOT site.
>
> On February 12, 1999, DOT was doing work on Highway 32 East which is located near the Odoms' home. The

DOT worker, Eddie Tookes, Sr. was acting as a flagman since traffic was limited to one lane.

Prior to seeing Respondent that day, Mr. Odom had passed through the work site several times. When speaking with Mr. Tookes, Mr. Odom asked him his name which Mr. Tookes would not give.

Mr. Tookes, Sr. had been initially charged for the burglary at the Odoms' house but later his son, Eddie Tookes, Jr. was charged. At Mr. Odom's insistence, Respondent accompanied Mr. Odom back to the work site. When they arrived, Mr. Tookes asked Mr. Odom if he had brought it to him. Respondent answered that "we brought that" indicating a gun he had in his left hand. Respondent "palmed the gun," i.e., raised it, holding it in his left palm. He further told Mr. Tookes that he could get this if he came over to Mr. Odom's house.

Respondent returned with Mr. Odom back to his house. Then he and the assistant principal drove back to work stopping again at the work site. Respondent spoke with Mr. Tookes again, telling him not to "go messing with old folks like that." At that time, Mr. Tookes accused Respondent of having pointed a gun at him which Respondent denied.

As a result of the February 12, 1999 incident, Respondent was indicted for aggravated assault and terroristic threats. He has not been convicted.

Respondent has a good reputation in the community where he lives.

(Citation and punctuation omitted.)

The ALJ noted in her discussion of the evidence that there was conflicting testimony over whether Mr. Tookes' interaction with Mr. Odom as Mr. Odom passed through the DOT work site simply involved "teasing" or instead was a calculated effort to extort money. The ALJ further pointed out that Superintendent Alberson and Mr. Tookes gave conflicting testimony over their first confrontation on the side of the highway, with Mr. Tookes claiming that Superintendent Alberson stated "I'll blow your brains out, you black s.o.b.," and Superintendent Alberson claiming that he only warned Mr. Tookes "you'll get this if you come to Mr. Odom's home." The ALJ explained that in view of this conflicting testimony, her findings of fact had been "conservatively made relying largely on the admissions of Respondent" rather than on the testimony of Mr. Tookes.

Based on her findings of fact, the ALJ concluded:

Although Respondent's attorney is correct that there was no persuasive evidence that this incident had diminished Respondent's effectiveness as a superintendent, the vigilante behavior and use of a gun, whether directly pointed or not, to frighten Mr. Tookes is sufficient to find a violation. This is personal conduct detrimental to the morals of pupils and could also fall under any other good and sufficient cause.

The ALJ rejected the PSC's requested sanction of certificate revocation and instead recommended a three-month suspension.

On January 9, 2003, the PSC conducted a hearing to review the ALJ's decision, and issued its final decision adopting the findings of fact and conclusions of law reached by the ALJ. However, the PSC concluded a more severe sanction was warranted and suspended Superintendent Alberson's certificate for one year.

Superintendent Alberson appealed the PSC's final decision to the Superior Court of Turner County pursuant to OCGA § 50-13-19. In its order reversing the PSC's final decision, the superior court concluded that "[t]here was *no* evidence in the record that the 'morals' of any pupil or student had been affected in any way by what happened on February 12, 1999" in violation of Interim Ethics Rule 505-2-.03 (1) (n). (Emphasis in original.) In support of this conclusion, the superior court noted that at the evidentiary hearing, the "Transportation Director, Food Services Director, High School Resource Officer, Director of Coastal Plains RESA, Superintendent of Irwin County Schools, and the retired Superintendent of Worth County Schools" all testified that they had not personally observed any negative impact on the student body resulting from the incident. Additionally, the superior court concluded that there was no other identified "good and sufficient cause" under Interim Ethics Rule 505-2-.03 (1) (o) upon which Superintendent Alberson's suspension could be based, and that, in any event, subsection (1) (o) was void for vagueness under the Constitution of the State of Georgia and the United States Constitution. It is from this order that the PSC sought discretionary review, which we granted.

1. The PSC first contends that the superior court erred because the PSC's decision to suspend Superintendent Alberson's educator certificate under Interim Ethics Rule 505-2-.03 (1) (n) and (o) was not clearly erroneous. Under the Administrative Procedure Act, an administrative agency's findings and conclusions may be reversed by the superior court if they are "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." OCGA § 50-13-19 (h) (5). "This language has been interpreted to preclude review if 'any evidence' on the record substantiates the administrative agency's findings of fact and conclusions of law. *Ga.*

*Dept. of Human Resources v. Holland,* 133 Ga. App. 616 (211 SE2d 635) [(1974)]." *Flowers v. Ga. Real Estate Comm.,* 141 Ga. App. 105 (1) (232 SE2d 586) (1977); see also *Emory Univ. v. Levitas,* 260 Ga. 894, 898 (1) (401 SE2d 691) (1991). "The presence of conflicting evidence . . . is sufficient to satisfy the any evidence standard." (Citation omitted.) *Ga. Power Co. v. Ga. Public Svc. Comm.,* 196 Ga. App. 572, 580 (5) (396 SE2d 562) (1990). "Upon further discretionary appeal to this Court, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the . . . administrative agency." (Citations and punctuation omitted.) *Sawyer v. Reheis,* 213 Ga. App. 727, 729 (1) (445 SE2d 837) (1994).[2]

With these principles in mind, we conclude that the superior court erred by holding that there was no evidence supporting the conclusion of the PSC and ALJ that Superintendent Alberson violated Interim Ethics Rule 505-2-.03 (1) (n) and (o). Here, there was evidence in the administrative record that on the day of the incident, after Mr. Odom heard Mr. Tookes' voice at the DOT work site, he immediately reported it to the sheriff's department. However, after speaking with Mr. Odom, and believing that the sheriff's department was too slow in its response, Superintendent Alberson decided to take matters into his own hands. He traveled to the DOT work site twice to confront Mr. Tookes, and on one of those occasions admittedly displayed his firearm in view of Mr. Tookes. Superintendent Alberson instigated these potentially explosive confrontations on a public highway, on a school day, during school hours.

There was also evidence in the record that Alberson, as a school superintendent, was expected to serve as a role model to students. Austin Scott, a member of the Georgia legislature, testified that school superintendents set an example for members of the community; Allan Smith, superintendent of the Irwin County School System, agreed that a superintendent "should lead by example"; and James Alan Kimbro, retired superintendent of Worth County, agreed that a superintendent occupies a "high-profiled position in the community" and thus leads students and faculty by example. Moreover, Sam Allen, superintendent of the Valdosta City School System,

---

[2] We point out that in reviewing the final decision of the PSC under the "any evidence" standard, the superior court and this Court may look to the administrative record *as a whole* to see if there is any evidence supporting the agency's findings of fact and conclusions of law. See OCGA § 50-13-19 (h) (5) (agency decision can be reversed only if it is "clearly erroneous in view of the reliable, probative, and substantial evidence *on the whole record*") (emphasis supplied); see also *Professional Standards Comm. v. Valentine,* 269 Ga. App. 309, 312-313 (603 SE2d 792) (2004) (concluding that factual basis existed for PSC decision based on factual findings of ALJ, as well as other factual evidence contained in the administrative record that defendant was having severe emotional anger problems requiring medication and counseling).

testified that superintendents lead by example "[t]wenty-four hours a day" in their personal lives as well as their professional lives, and he agreed that a "superintendent is under a fair amount of scrutiny in his community." See also *Terry v. Houston County Bd. of Ed.*, 178 Ga. App. 296, 297 (342 SE2d 774) (1986) (school officials are "considered professionals whose services are affected with the public interest") (citation and punctuation omitted).

Finally, there was testimony in the record of several witnesses that violence and the use of weapons by students is a significant public policy concern in the Georgia educational system, and that public school administrators and faculty have a strong interest in discouraging any use of firearms on campus. Indeed, the Georgia legislature has enacted strict penalties applicable to students who bring firearms onto a public school campus and engage in violent conduct. See OCGA § 20-2-750 et seq.

This evidence in the administrative record, taken together, was sufficient to permit the PSC to conclude that Superintendent Alberson's conduct was "detrimental to the . . . morals of pupils" under Interim Ethics Rule 505-2-.03 (1) (n). The PSC was entitled to conclude that by taking matters into his own hands and brandishing the firearm while threatening Mr. Tookes — an incident that was "general knowledge" among members of the community after it occurred — Superintendent Alberson set a poor example for his students, inappropriately conveying to them that it was acceptable to use firearms and to make violent threats in order to resolve disputes, even though law enforcement was otherwise available to address the matter. The PSC was entitled to view the setting of such an example as having a detrimental impact on the "morals" of students. Cf. *Pryor Organization v. Stewart*, 274 Ga. 487, 490 (554 SE2d 132) (2001) (holding that sheriff was authorized to conclude that professional surety applicant who acted as a "vigilante" lacked good moral character and "that his conduct in that regard reflect[ed] adversely upon his qualification to serve").

Likewise, Superintendent Alberson's bad conduct and example served as "good and sufficient cause" for the suspension of his educator certificate under Interim Ethics Rule 505-2-.03 (1) (o). Compare *Clinch County Bd. of Ed. v. Hinson*, 247 Ga. App. 33 (543 SE2d 91) (2000) (local board of education was entitled to terminate employment contract of school official based on the statutory ground of "good and sufficient cause" in addition to the separate statutory ground of "incompetency"); *Rabon v. Bryan County Bd. of Ed.*, 173 Ga. App. 507 (326 SE2d 577) (1985) (same).

In reaching the opposite conclusion, the superior court relied on the testimony of several witnesses to the effect that they had not personally observed any visible signs that Superintendent Alberson's

conduct had detrimentally affected the morality of Turner County pupils. However, this testimonial evidence at most created a conflict with the evidence discussed above. The superior court was not authorized to "substitute" its "judgment for that of the hearing officer as to the weight of the evidence on questions of fact." *Professional Standards Comm. v. Valentine*, 269 Ga. App. at 312-313. See also *Ga. Power Co. v. Ga. Public Svc. Comm.*, 196 Ga. App. at 580 (5) ("The presence of conflicting evidence . . . is sufficient to satisfy the any evidence standard.").

Furthermore, the superior court erred to the extent that it assumed that there had to be direct evidence affirmatively demonstrating that Superintendent Alberson's conduct causally led to a decline in the morals of students. We recently rejected a similar position in *Professional Standards Comm. v. Valentine*, 269 Ga. App. at 312-313. It is sufficient for an administrative record to contain evidence of conduct by a school official from which an adverse consequence on the student body can be inferred by the PSC, given the grave nature of the conduct itself. Compare *Clinch County Bd. of Ed. v. Hinson*, 247 Ga. App. at 36 (1) (d) (school official may be sanctioned for "incompetence" even without additional "evidence show[ing] that his actions disrupted or impaired discipline or teaching"). Such a conclusion accords with the public policy that school disciplinary boards are to have "broad discretion in the management of school affairs" in order to ensure that school systems are able to "secur[e] the employ only of those fit to serve the public interest." (Citation and punctuation omitted.) *Terry v. Houston County Bd. of Ed.*, 178 Ga. App. at 297.

For these reasons, we conclude that there was some evidence in the administrative record supporting the PSC's decision to suspend Superintendent Alberson's educator certificate under Interim Ethics Rule 505-2-.03 (1) (n) and (o). We therefore reverse the ruling of the superior court reaching the opposite conclusion.

2. The PSC also contends that the superior court erred by holding that the "good and sufficient cause" standard contained in Interim Ethics Rule 505-2-.03 (1) (o) was void for vagueness under the due process clauses of the Constitution of the State of Georgia and the United States Constitution.[3] As an initial matter, we note that due process protections applied to Superintendent Alberson in this case because he had a property interest in his educator certificate that was

---

[3] The exclusive appellate jurisdiction of the Supreme Court of Georgia under Ga. Const. 1983, Art. VI, Sec. VI, Par. II does not extend to questions concerning the constitutionality of an administrative regulation. *Brosnan v. Undercofler*, 220 Ga. 239 (138 SE2d 314) (1964); *Ga. Oilmen's Assn. v. Ga. Dept. of Revenue*, 261 Ga. App. 393, 394 (582 SE2d 549) (2003). Thus, we have jurisdiction to resolve whether Interim Ethics Rule 505-2-.03 (1) (o) is constitutional.

protected under the Georgia and United States Constitutions. *Gee v. Professional Practices Comm.*, 268 Ga. 491, 493 (1) (491 SE2d 375) (1997).

Although originally developed as one component of the due process safeguards afforded to defendants in criminal cases, the void for vagueness doctrine has been extended to civil cases. See, e.g., *Arnett v. Kennedy*, 416 U. S. 134, 158-164 (94 SC 1633, 40 LE2d 15) (1974); *Anderson v. Atlanta Comm. for Olympic Games*, 273 Ga. 113, 114-115 (1) (a) (537 SE2d 345) (2000). However,

> [t]he application of due process with respect to vagueness and uncertainty is not applied as strictly to civil statutes as to those penal in nature. The rule is that a statute may be too vague and uncertain to be capable of enforcement as a penal statute and yet may be sufficiently certain to set forth a rule of civil conduct.

(Citation and punctuation omitted.) *Willis v. Jackson*, 148 Ga. App. 432, 437 (9) (251 SE2d 341) (1978); see also *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U. S. 489, 498-499 (102 SC 1186, 71 LE2d 362) (1982).

In the civil context,

> [a] statute must be definite and certain to be valid, and when it is so vague and indefinite that persons of common intelligence must necessarily guess at its meaning and differ as to its application, it violates the first essential of due process of law. To withstand an attack of vagueness or indefiniteness, a civil statute must provide fair notice to those to whom the statute is directed and its provisions must enable them to determine the legislative intent.

*Anderson v. Atlanta Comm. for Olympic Games*, 273 Ga. at 114 (1) (a). However, "mathematical certainty is not necessary in statutes," (citation and punctuation omitted) *Dorsey v. State*, 212 Ga. App. 830, 831 (1) (442 SE2d 922) (1994), and the "prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." (Citation and punctuation omitted.) *Wilson v. State*, 245 Ga. 49, 53 (2) (262 SE2d 810) (1980).

"[A] constitutional attack to a statute on a vagueness ground that does not involve a First Amendment challenge must be decided on the particular facts of each case." *State v. Boyer*, 270 Ga. 701, 702 (1) (512 SE2d 605) (1999); *Simmons v. State*, 262 Ga. 674 (424 SE2d 274) (1993). Thus, where, as here, the party challenging the statute or

regulation does not allege that its purported vagueness implicates his First Amendment rights, the operative inquiry is whether the provision at issue gave the defendant due notice that it prohibited the conduct for which he was punished. *State v. Boyer*, 270 Ga. at 702 (1).

With these principles as a backdrop, we turn to whether Interim Ethics Rule 505-2-.03 (1) (o) gave Superintendent Alberson due notice that his decision to bypass the sheriff's department and take the law into his own hands by brandishing a firearm and threatening Mr. Tookes on a public highway during school hours could constitute "good and sufficient cause" for the suspension of his educator certificate. We believe that it did, particularly when considered in light of the fact that school superintendents serve as important role models to students in their public and private lives, and given that firearm use among students is a major public policy concern among educators and legislators, as discussed supra in Division 1. Compare *Wishart v. McDonald*, 500 F2d 1110, 1116-1117 (1st Cir. 1974) (concluding that tenured teacher had sufficient notice that his notorious off-campus sexual conduct could lead to discipline as "conduct unbecoming a teacher" because "his image as an elementary school teacher would be gravely jeopardized"). Our decision in this regard is further buttressed by the fact that a federal court analyzing a Georgia education statute similarly held that the "incompetence, immorality, and any good and sufficient cause" disciplinary standard contained therein was not impermissibly vague. See *Logan v. Warren County Bd. of Ed.*, 549 FSupp. 145, 149 (S.D. Ga. 1982).

Both the United States Supreme Court and this Court have recognized the particular need for flexibility in drafting standards governing public employee discipline. In *Arnett v. Kennedy*, the United States Supreme Court rejected a vagueness challenge and upheld a statutory standard that permitted the discharge of public employees "for such cause as will promote the efficiency of the service." Id. at 158-164.[4] The Supreme Court noted that "[t]he most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming,'" and that "[i]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in" discipline. (Citation and punctuation omitted.) Id. at 161.

Similarly, in *Willis v. Jackson* we upheld an administrative regulation that permitted the disciplining of a municipal employee

---

[4] Although sections of Chief Justice Rehnquist's opinion in *Arnett* were only joined by a plurality, his treatment of the vagueness issue was joined by a majority of the Justices. *Arnett v. Kennedy*, 416 U. S. at 164, 177.

for a "conflict of interest." Id. at 437-438 (9). After discussing *Arnett*, we concluded that "the language complained of is not too vague, indefinite, and uncertain to be enforceable and is not in violation of due process." Id. at 438 (9). See also *Pryor Organization v. Stewart*, 274 Ga. at 491 ("The term 'good moral character' is sufficiently definite to apprise an individual . . . that he or she cannot engage in unauthorized acts of law enforcement. . . .").

Finally, several courts have upheld broadly worded disciplinary standards against vagueness attacks in cases specifically involving the discipline of school officials. See *San Filippo v. Bongiovanni*, 961 F2d 1125, 1134-1138 (3rd Cir. 1992) (upholding against vagueness challenge regulation that permitted dismissal of tenured faculty for failing, among other things, "to maintain standards of sound scholarship and competent teaching"); *Fowler v. Bd. of Ed. of Lincoln County, Kentucky*, 819 F2d 657, 664-666 (6th Cir. 1987) (upholding against vagueness challenge dismissal standard of "conduct unbecoming a teacher"); *Wishart v. McDonald*, 500 F2d at 1116-1117 (upholding against vagueness challenge school dismissal regulation permitting termination for, among other things, "conduct unbecoming a teacher . . . or other good cause"); *Frison v. Franklin County Bd. of Ed.*, 596 F2d 1192, 1193-1194 (4th Cir. 1979) (upholding against vagueness challenge school dismissal regulation permitting termination for "neglect of duty"); *Garrett v. Mathews*, 474 FSupp. 594, 599 (N.D. Ala. 1979), aff'd, 625 F2d 658 (5th Cir. 1980) (upholding against vagueness challenge dismissal regulation authorizing termination of tenured faculty for "adequate cause"); *Phillips v. State Bd. of Regents &c.*, 863 SW2d 45, 48-50 (Tenn. 1993) (rejecting void for vagueness challenge to State Board of Regents regulation permitting termination of tenured faculty for "capricious disregard of accepted standards of professional conduct").

The "good and sufficient cause" standard at issue here is no more indefinite than the standards discussed in the cases cited above. As the United States Supreme Court has stated in a slightly different context, "[g]iven [a] school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel School Dist. No. 403 v. Fraser*, 478 U. S. 675, 686 (106 SC 3159, 92 LE2d 549) (1986); see also *Terry v. Houston County Bd. of Ed.*, 178 Ga. App. at 297 (noting that public officials should have "broad discretion in the management of school affairs" because "the ability to discharge even tenured personnel when deemed necessary to the proper functioning of the school is essential to the exercise of authority over a school system") (citation and punctuation omitted).

Accordingly, we conclude that the "good and sufficient cause" standard enunciated in Interim Ethics Rule 505-2-.03 (1) (o) is not unconstitutionally vague as applied under the circumstances of this case. We consequently reverse the ruling of the superior court on this issue.

*Judgment reversed. Blackburn, P. J., and Miller, J., concur.*

DECIDED APRIL 19, 2005.

*Thurbert E. Baker, Attorney General, Langley & Lee, William W. Calhoun, Christina L. Folsom, Penny Hannah,* for appellant.
*James D. Dunham,* for appellee.

