**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**December 27, 2017**

# In the Court of Appeals of Georgia

A17A1885. QUIGG v. GEORGIA PROFESSIONAL STANDARDS COMMISSION.

BARNES, Presiding Judge.

Following the grant of her application for discretionary appeal, Linda Jean Quigg, former superintendent of the Thomas County School District ("School District"), appeals the superior court's order affirming the final decision of the Georgia Professional Standards Commission ("Commission") to suspend her educator's certificate for 60 days. Quigg argues that the Commission's initial investigation of her three alleged ethical violations was conducted in a procedurally improper manner and that the Commission's decision to suspend her educator's license therefore was made in excess of statutory authority, upon unlawful procedure, and in violation of her due process rights. Quigg also contends that the Commission's decision to sanction her for three alleged ethical violations was clearly erroneous because it was unsupported by the evidence on the whole administrative record.

For the reasons discussed more fully below, the Commission's decision to sanction Quigg for dishonesty under Standard 4 of the Code of Ethics for Educators ("Ethics Code") for her involvement in a revision made to her daughter's high school transcript to include a personal fitness credit was clearly erroneous in view of the whole record, given that Quigg was no longer serving as superintendent and had retired from the School District when the incident occurred and thus was not acting "in the course of professional practice." We therefore reverse the superior court's order to the extent that it affirmed the Commission's decision to sanction Quigg for that alleged ethical violation and remand for further action consistent with this opinion. We affirm the superior court's order in all other respects.

On appeal, we view the evidence presented at the administrative hearing in the light most favorable to the agency's decision. *Bowman v. Palmour*, 209 Ga. App. 270, 270 (1) (433 SE2d 380) (1993). So viewed, the evidence showed that Quigg held a teaching certificate in Georgia at all times relevant to the present case. Quigg started her career in the School District as an elementary school teacher. Quigg subsequently left the School District and worked elsewhere for several years, but she later returned to the School District and was promoted to the position of assistant principal and then to the position of assistant superintendent of curriculum and instruction. In 2007,

2

Quigg was promoted to the position of School District superintendent and served in that position until the School District chose not to renew her contract in June 2011.[1]

Quigg had two daughters who attended the Thomas County High School during her tenure as superintendent. The ethical violations alleged against Quigg arise out of a temporary change in the School District's policy regarding dual enrollment students in the 2009-2010 school year that benefitted Quigg's oldest daughter; the removal of confidential student files from Quigg's work computer; and the inclusion of course credit for personal fitness on the high school transcript of Quigg's younger daughter even though she had not taken that course.

*Dual Enrollment Policy.* When Quigg served as superintendent, Georgia's Accel Program administered by the Georgia Student Finance Commission offered high school students the opportunity to enroll in college courses and earn credit hours toward a college degree while simultaneously meeting their high school graduation requirements. The Accel Program was funded by the Georgia Lottery and provided financial assistance for the cost of the college courses taken by high school students

---

[1]Quigg questioned the basis for the non-renewal of her contract and filed charges of gender discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). After the EEOC granted her a "right to sue" letter, Quigg filed a federal discrimination suit against the School District and other defendants. The final resolution of that case is unclear from the record.

enrolled in approved dual enrollment programs. A State regulation issued by the Georgia Department of Education ("DOE") required that the grades earned by dual enrollment students in college courses be placed on the students' high school transcripts and be used in computing their high school grade point averages (the "Dual Enrollment Regulation").[2]

Before and after the 2009-2010 school year, all grades of dual enrollment students in the School District were posted on students' transcripts in compliance with the State's Dual Enrollment Regulation. But, for the 2009-2010 school year only, the School District adopted a new policy of posting the college class grades of some, but not all, dual enrollment students on their high school transcripts, which violated the Dual Enrollment Regulation. Under the School District's new policy,

---

[2] Ga. Comp. R. & Regs. r. 160-4-2-.34 (6) (b) (2009) provided: "The grades and amount of credit for each approved course for students who participate in approved dual enrollment programs shall be placed on high school transcripts and shall be used in computing grade point averages." Ga. Comp. R. & Regs. r. 160-4-2-.34 (2) (e) (2010) provided: "For students who participate in approved dual enrollment programs, the grades and amount of credit for each approved course shall be placed on high school transcripts and shall be used in computing grade point averages." The current version of the regulation contains the same requirement. See Ga. Comp. R. & Regs. 160-4-2-.34 (2) (d) (2) (2017) ("Grades earned at an eligible postsecondary institution shall be included on the high school transcript and shall be used, by the eligible high school, to compute a student's grade point average.").

whether college course grades were included on a dual enrollment student's high school transcript depended on the student's SAT score and whether the student needed the credit from the college class to graduate.

Quigg participated in meetings where the change in the dual enrollment policy was discussed and saw emails questioning the validity of the change for the 2009-2010 school year. One result of this change in policy was that the grades earned by Quigg's oldest daughter in her dual enrollment classes, including a "D" in one college class, were not posted on her high school transcript. If the grades had been posted on the daughter's transcript, they would have lowered her grade point average. Additionally, the School District reported students, including Quigg's older daughter, as dual enrollment students to the Georgia Student Finance Commission for funding purposes under the Accel Program, even though the students' college course grades were not posted on their transcripts as required by the Dual Enrollment Regulation.

*The Confidential Student Files.* The non-renewal of Quigg's contract as superintendent was effective June 30, 2011. Before she left the School District, Quigg downloaded all of the electronic files from her work computer onto external flash drives and deleted all of the information on the hard drive. The files included

confidential student information, such as test scores and student identification numbers.

*Personal Fitness Course Credit.* The School District had a longstanding practice of allowing students to meet the State graduation requirement of taking a personal fitness class by instead taking marching band. However, a State regulation issued by the DOE permitted only Junior ROTC to be substituted for personal fitness credit (the "Personal Fitness Regulation").[3]

After her tenure as superintendent ended, Quigg retired from the School District and moved with her family to Oconee County, where her younger daughter enrolled in high school for the 2011-2012 academic year. Her daughter had taken marching band at her high school in Thomas County, but not personal fitness. Before

_____

[3] Ga. Comp. R. & Regs. r. 160-4-2-.48 (5) (VI) (2009) provided:
Health and Physical Education: One unit of credit in health and physical education is required. Students shall combine one-half or one-third units of credit of Health (17.011), Health and Personal Fitness (36.051), or Advanced Personal Fitness (36.061) to satisfy this requirement. Three (3) units of credit in JROTC (Junior Reserve Officer Training Corps) may be used to satisfy this requirement under the following conditions: 1) JROTC courses must include Comprehensive Health and Physical Education Rule requirements in rule 160-4-2-.12 and 2) the local Board of Education must approve the use of ROTC courses to satisfy the one required unit in health and physical education.
The regulation was amended in 2011 but contains the same language pertaining to personal fitness. See Ga. Comp. R. & Regs. r. 160-4-2-.48 (5) (VI) (2017).

6

school started, when an Oconee County School District counselor informed Quigg that her daughter did not have a personal fitness credit as required for graduation, Quigg contacted the principal at her daughter's former school and asked him to check on her daughter's transcript in light of the School District's longstanding policy of allowing personal fitness credit for marching band. After speaking with Quigg, the principal contacted the clerk of student records at the daughter's former school, who revised the daughter's transcript to substitute a personal fitness credit for marching band. The clerk then sent the revised transcript to Oconee County.

*The Investigation.* George Kornegay succeeded Quigg as superintendent of the School District in July 2011. Quigg and Kornegay had a strained working relationship dating back several years. After becoming the new superintendent, Kornegay learned that Quigg had removed all of the electronic files from the hard drive of her work computer. Counsel for the School District requested that Quigg return the electronic files, and she complied with the request. Based on the information contained in the electronic files and upon learning of the School District's policies during Quigg's tenure that violated the Dual Enrollment Regulation and Personal Fitness Regulation, Kornegay became concerned that further investigation was needed to determine whether Quigg had violated any ethical rules. Kornegay took steps to have the School

7

District rescind the dual enrollment and personal fitness policies that had been in effect during Quigg's tenure as superintendent and to enact a new dual enrollment policy consistent with the State's Dual Enrollment Regulation. Kornegay also had the personal fitness credit removed from the high school transcript of Quigg's younger daughter and a new transcript sent to Oconee County reflecting that she had taken band rather than a personal fitness class.

In February 2012, Kornegay emailed John Grant, the Commission's chief investigator for ethics violations, and requested help in determining whether any of the "irregular" practices he had identified in the School District rose to the level of reportable ethics violations. Later that month, before a formal written request for an investigation had been filed with and approved by the Commission, Grant traveled to Thomas County, where he reviewed documents, interviewed some of the School District's staff, and met with Kornegay.

Following Grant's initial investigation and after receiving input from him, Kornegay submitted a written request for an investigation of Quigg to the Commission in March 2012. The request alleged that Quigg had violated the Code of Ethics for Educators issued by the Commission ("Ethics Code") based on her

8

conduct relating to the School District's dual enrollment policy and the personal fitness policy and her removal of confidential student files from her work computer.

In April 2012, the Commission's Educator Ethics Review Committee reviewed the written request submitted by Kornegay and recommended an investigation of Quigg to the Commission, and the Commission authorized the investigation of Quigg for the aforementioned alleged ethical violations. In July 2012, after some additional investigation by Grant, the Commission notified Quigg that it had found probable cause to recommend disciplinary action against her. Following the Commission's finding of probable cause, Quigg requested a full evidentiary hearing before an administrative law judge ("ALJ") with the Office of State Administrative Hearings.

Prior to the administrative hearing, the Commission filed a Statement of Matters Asserted that detailed the ethics charges against Quigg relating to the School District's dual enrollment and personal fitness policies and the removal of confidential student files from her work computer. The Commission alleged that Quigg's conduct violated Ethics Code Standard 4, "Honesty," and Standard 10, "Professional Conduct." See Ga. Comp. R. & Regs., r. 505-6-01 (3) (d) (2), (j). Based on Quigg's alleged ethical violations, the Commission sought the suspension of Quigg's educator's certificate for 90 contract days. Quigg filed an answer to the

9

Commission's Statement of Matters Asserted, denying any violation of the Ethics Code.

The ALJ conducted the requested hearing at which the Commission and Quigg introduced documentary evidence and multiple witnesses testified, including Kornegay, Grant, and Quigg. After the hearing, the Commission and Quigg both submitted proposed orders containing findings of fact and conclusions of law. In her proposed order, Quigg asserted that there was insufficient evidence to support a finding that she had committed any ethics violations relating to the dual enrollment and personal fitness policies and the removal of confidential student files. Quigg further asserted that Commission had violated the applicable statutory framework and her due process rights based on procedural irregularities in the manner in which Grant conducted the investigation.

Following the hearing and receipt of the parties' proposed orders, the ALJ entered a detailed order containing findings of fact and conclusions of law. The ALJ noted that while it had "concerns about the procedures that were followed" in the investigation of the case, the Commission had substantially complied with the statutory framework for investigating ethics violations and Quigg had failed to show

that she suffered any prejudice resulting from the manner in which the investigation had been conducted.

As to the factual allegations raised by the Commission, the ALJ found that there was insufficient evidence that Quigg was the "mastermind" who orchestrated the one-time change to the School District's dual enrollment policy for the 2009-2010 school year and the policy of allowing students to receive personal fitness credit for taking marching band. The ALJ concluded, however, that the evidence still supported a finding that Quigg had violated Ethics Code Standards 4 and 10 through her inaction in response to the change in the dual enrollment policy that she was aware violated the State's Dual Enrollment Regulation; her unjustified removal of the confidential student files from her computer; and her efforts to have her daughter's transcript changed to substitute a personal fitness credit for band when she knew that the School District's personal fitness policy violated the State's Personal Fitness Regulation. But, the ALJ declined to suspend Quigg's educator's certificate for 90 contract days as recommended by the Commission and instead concluded that a suspension of 60 days was "more suitable to the proven allegations."

The decision of the ALJ was made the final decision of the Commission. Quigg filed a petition for judicial review in the superior court, challenging the sufficiency

11

of the evidence and the alleged procedural irregularities in the manner in which the Commission's investigation was conducted. The superior court held a hearing on the petition and entered an order affirming the final decision of the Commission. Quigg filed an application for discretionary appeal with this Court, which we granted, resulting in the present appeal.

Under the Georgia Administrative Procedure Act, OCGA § 50-13-1 et seq. (the "APA"), the administrative agency "is the finder of fact and weighs the credibility of the evidence," *Ga. Public Svc. Comm. v. Southern Bell*, 254 Ga. 244, 246 (327 SE2d 726) (1985), and in reviewing the agency's decision, the superior court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." OCGA § 50-13-19 (h). See *Ga. Public Svc. Comm. v. Alltel Ga. Communications Corp.*, 244 Ga. App. 645, 647 (536 SE2d 542) (2000). But, the agency's decision may be reversed or modified by the court

> if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by other error of law; (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6)

Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 50-13-19 (h). "Upon further discretionary appeal to this Court, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the [administrative agency]." (Citation and punctuation omitted.) *Alltel Ga. Communications Corp.*, 244 Ga. App. at 647.

1. Quigg contends that the Commission's decision to sanction her educator's certificate must be reversed under OCGA § 50-13-19 (h) (2) and (3) because the Commission's decision was made in excess of statutory authority and upon unlawful procedure, given the manner in which the Commission conducted the investigation. We conclude that even if the Commission failed to comply with the proper statutory procedures in conducting the initial investigation, Quigg has failed to show that her substantial rights were prejudiced by the procedural impropriety and thus has failed to establish a basis for reversal of the Commission's decision under the APA.

One of the legislative purposes of the Georgia Professional Standards Act, OCGA § 20-2-981 et seq. (the "Act"), is to provide a process for the Commission "[t]o investigate reports of specified criminal conduct, violations of professional or ethical codes of conduct, and violations of certain rules, regulations, and policies by

13

school system educators." OCGA § 20-2-982 (6). To that end, the Act authorizes the Commission to begin an investigation of alleged ethical violations "[u]pon receipt of a written request from a local board, the state board, or one or more individual residents of this state." OCGA § 20-2-984.3 (a) (2).[4] Once a written request for an investigation is received, the Commission must decide whether to conduct a preliminary investigation of the alleged ethical violations within 30 days of the request or seek an extension. OCGA § 20-2-984.3 (b).[5] If the Commission determines that a preliminary investigation is warranted, an investigator of the Commission conducts the preliminary investigation to determine if probable cause exists to recommend disciplinary action. OCGA § 20-2-984.4 (a).[6] The Commission has

---

[4] OCGA § 20-2-984.3 (a) (2) provides:
Upon receipt of a written request from a local board, the state board, or one or more individual residents of this state, the commission shall be authorized to investigate . . . [a]lleged violations by an educator of the code of ethics of the commission[.]

[5] OCGA § 20-2-984.3 (b) provides in part:
The commission shall decide whether to conduct a preliminary investigation pursuant to this Code section within 30 days of the request unless an extension is granted pursuant to the procedure outlined in subsection (b) of Code Section 20-2-984.5. . . .

[6] OCGA § 20-2-984.4 (a) provides in part:
If the commission agrees to investigate matters reported under Code

14

authority during the investigation to conduct plenary hearings, issue subpoenas,

administer oaths and affirmations, and access criminal histories of educators, OCGA

§ 20-2-984.4 (b),[7] but the Commission investigator is limited to investigating the

Section 20-2-984.2 or Code Section 20-2-984.3, an investigator of the commission shall conduct a preliminary investigation of the reported matters to determine if probable cause exists to recommend disciplinary action. . . .

[7] OCGA § 20-2-984.4 (b) provides:
In conducting an investigation authorized by this Code section, the commission shall:
(1) Be authorized to conduct plenary hearings;
(2) Have the power to administer oaths and affirmations;
(3) Have the power to issue subpoenas in the name of the commission to compel the attendance of witnesses and the production of documents and any other things to be used as evidence. Such subpoenas shall be served in any manner now or hereafter provided for service of subpoenas issued by the superior courts. In the event any person fails or refuses to obey a subpoena issued under this paragraph, such failure or refusal shall constitute contempt of the commission. Upon application by the commission to the superior court of the county wherein such person resides or is found, the superior court shall have power, after notice and hearing, to adjudge such person in contempt and to punish such person by a fine not exceeding $300.00 or by imprisonment not exceeding 20 days or by both such fine and imprisonment and to enter such other orders and take such other action as may be necessary to enforce compliance with and obedience to the subpoena. At such hearing, the person subpoenaed shall be entitled to make any defense and to show any valid reason why he or she failed or refused to comply with the subpoena; and
(4) Have the power to access criminal histories of educators through the Georgia Crime Information Center and the National Crime Information

matters asserted in the original written request unless additional written requests are filed. OCGA § 20-2-984.4 (c).[8]

Quigg argues that the Commission failed to follow the proper procedure in conducting the preliminary investigation into her alleged ethical violations because Grant began assisting the School District with the investigation before the formal written request for an investigation had been filed with the Commission by Kornegay and before the Commission had determined that a preliminary investigation was warranted.[9] However, even if the Commission failed to follow the proper statutory procedures for conducting a preliminary investigation, there is no evidence that the

Center. This access shall include a GCIC terminal. Information provided by GCIC or NCIC shall be used in accordance with Code Section 35-3-35 and with applicable federal and state laws, rules, or regulations.

[8] OCGA § 20-2-984.4 (c) provides in part: "The investigation conducted pursuant to this Code section is limited to the matters asserted in the written complaint unless additional written complaints are filed. . . ."

[9] Although the Act authorizes the Commission to provide "consultative services pertaining to the teaching profession to anyone who has a vested interest in education and make recommendations to the state board or to local boards which will promote an improvement in the teaching profession," the Act provides that the "investigative powers of the [C]ommission may not be exercised" in conducting such a consultation. OCGA § 20-2-984 (h). Grant's actions in traveling to the School District to assist Kornegay thus constituted an investigation rather than "consultative services" under the terms of the Act.

16

procedural irregularity prejudiced any of Quigg's substantial rights so as to authorize the reversal or modification of the Commission's decision to sanction her. See OCGA § 50-13-19 (h); *Bd. of Regents of the Univ. Sys. of Ga. v. Houston*, 282 Ga. App. 412, 415 (1) (638 SE2d 750) (2006); *Safety Fire Commr. v. U.S.A. Gas*, 229 Ga. App. 807, 810 (5) (494 SE2d 706) (1997).[10]

The record reflects that Grant, the Commission investigator, began his preliminary investigation into Quigg's three alleged ethical violations after receiving an email request for help from Kornegay, the current School District superintendent, rather than after a formal written request for an investigation had been submitted and approved for investigation by the Commission. Grant did not rely on any of the authorized powers that are part of a formal Commission investigation, see OCGA § 20-2-984.4 (b), but instead simply served as additional support to the School District, reviewing documents, interviewing some staff members, and speaking with

---

[10] Because Quigg has failed to demonstrate that her substantial rights were prejudiced by the alleged procedural irregularities, we need not resolve whether the Commission was required to act in strict or substantial compliance with the statutory procedures for investigations. See OCGA § 1-3-1 (c) ("A substantial compliance with any statutory requirement, especially on the part of public officers, shall be deemed and held sufficient, and no proceeding shall be declared void for want of such compliance, unless expressly so provided by law."); *Cook v. NC Two*, 289 Ga. 462, 464-465 (712 SE2d 831) (2011) (discussing rule of substantial compliance).

17

Kornegay. The School District subsequently submitted a formal written request to the Commission pursuant to OCGA § 20-2-984.3 (a) (2) that detailed Quigg's three alleged ethical violations that had initially been identified by Kornegay, and the Commission voted to approve a preliminary investigation of Quigg, as authorized by OCGA § 20-2-984.3 (b). After further investigation had been conducted and reviewed by the Commission, the Commission notified Quigg that it had found probable cause to suspend her educator's certificate. See OCGA § 20-2-984.5 (a), (c).[11] After Quigg contested the basis for the recommended suspension, she received a Statement of Matters Asserted from the Commission that detailed her alleged ethical violations.

_____

[11] OCGA § 20-2-984.5 (a) and (c) provide:
(a) After a preliminary investigation authorized by Code Section 20-2-984.4, the commission shall review the report of the investigator and either determine that no further action need be taken or recommend that a particular disciplinary action be imposed. This determination shall be made no later than the commission's regularly scheduled meeting next occurring after 60 days from receipt of the findings of the preliminary investigation. . . .
(c) If the commission finds that there is probable cause for imposing a sanction against the educator, it may recommend any combination of the following:
(1) That the educator be warned, reprimanded, monitored, or any combination thereof; or
(2) That the certificate of the educator be suspended, revoked, or denied. The commission shall provide to the educator, at the time of the initial probable cause finding, a written summary statement of the findings of fact upon which the probable cause was determined.

18

See OCGA § 50-13-13 (a) (2) (D).[12] A two-day administrative hearing before an impartial ALJ then was held in which Quigg was provided ample opportunity to present a full defense to the alleged violations. See OCGA § 20-2-984.5 (d).[13]

"An initial procedural violation can be cured by a subsequent procedural remedy." *Pryor Organization v. Stewart*, 274 Ga. 487, 491 (3) (554 SE2d 132) (2001). See *Murray v. Hooks*, 313 Ga. App. 485, 486 (722 SE2d 82) (2011). That is the situation here, where any initial irregularity in the Commission's investigatory procedure was cured by the subsequent procedures undertaken before the ALJ and the Commission and by the notice and full opportunity to be heard that was afforded to Quigg. Furthermore, there is no evidence that Grant's initial investigation led to ethics charges against Quigg different from the ones that Kornegay originally sought

---

[12] OCGA § 50-13-13 (a) (2) (D) provides that in contested cases, an agency shall provide a "short and plain statement of the matters asserted."

[13] OCGA § 20-2-984.5 (d) provides:
In a contested case, if the commission determines that probable cause exists to impose a sanction against an educator or to deny a certificate to an applicant, an opportunity for a hearing shall be provided to the educator or applicant pursuant to Code Section 50-13-41 [of the APA]. Based on the findings of fact and conclusions of law of the administrative law judge as provided in that Code section, the commission may take any combination of the actions referred to in subsection (c) of this Code section.

19

help in investigating. Under these circumstances, Quigg has not demonstrated that her substantial rights were prejudiced by the alleged procedural irregularities and therefore has failed to supply a basis for reversing or modifying the Commission's decision to sanction her. See id. See also *Ga. Dept. of Human Resources v. Odom*, 266 Ga. App. 493, 498 (597 SE2d 559) (2004) (appellant's substantial rights were not prejudiced, where appellant had "not shown how she was harmed by the procedure employed by the board in issuing its decision"). Cf. *State v. Lampl*, 296 Ga. 892, 896 (2) (770 SE2d 629) (2015) (defendant was not entitled to dismissal of indictment and suppression of grand jury testimony even though special purpose grand jury exceeded the scope of its authority in its investigation).[14] Accordingly, the trial court properly determined that the Commission's decision should not be reversed or modified under OCGA § 15-13-19 (h) based on a failure to follow proper investigatory procedures.

_____

[14] Quigg also argues that Grant's initial investigation, which occurred before the written request to investigate had been filed by the School District and the preliminary investigation had been approved by the Commission, was an ultra vires act that rendered the Commission's efforts to sanction her entirely null and void. But, an action is ultra vires only if it is beyond the power or authority of the governmental entity to perform under any circumstances; a procedural irregularity in the exercise of granted powers, as alleged to have occurred in the instant case, does not rise to the level of an ultra vires act. See *Faulk v. Twiggs County*, 269 Ga. 809, 811 (504 SE2d 668) (1998); *City of Atlanta v. North by Northwest Civic Assoc.*, 262 Ga. 531, 539 (7) (a) (422 SE2d 651) (1992); *Gove v. Sugar Hill Investment Assoc.*, 219 Ga. App. 781, 784 (2) (466 SE2d 901) (1995).

2. Quigg further contends that the procedural irregularities in the Commission's investigation violated her due process rights, necessitating the reversal of the sanctions imposed upon her.

Suspension of a professional license must satisfy the procedural due process requirements of the United States and Georgia Constitutions, and "due process requires that some form of a hearing must be held before one is finally deprived of their property interest in a professional license." *Gee v. Professional Practices Comm.*, 268 Ga. 491, 493 (1) (491 SE2d 375) (1997).

> The constitutionally-guaranteed right to due process of law is, at its core, the right of notice and the opportunity to be heard. Neither the federal nor the state constitution's due process right guarantees a particular form or method of procedure, but is satisfied if a party has reasonable notice and opportunity to be heard, and to present [his or her] claim or defense, due regard being had to the nature of the proceeding and the character of the rights which may be affected by it.

(Citations and punctuation omitted.) *Cobb County Sch. Dist. v. Barker*, 271 Ga. 35, 37 (2) (518 SE2d 126) (1999).

Here, Quigg was provided with detailed notice of the ethical charges brought against her in the Statement of Matters Asserted filed by the Commission, and she was afforded an opportunity to cross-examine the Commission's witnesses and

present her own witnesses and documentary evidence in the evidentiary hearing conducted before the ALJ. And, as previously noted, even if there were procedural irregularities in the initial investigation conducted by Grant, those irregularities were cured by the subsequent procedures, including the School District's filing of a written request for investigation, the Commission's approval of the investigation, and the full hearing before the impartial ALJ. See *Pryor Organization*, 274 Ga. at 491 (3); *Murray*, 313 Ga. App. at 486. Consequently, Quigg has failed to show that her due process rights were violated.

3. Quigg also contends that the Commission's decision to sanction her for (a) her conduct relating to the dual enrollment policy, (b) the removal of confidential student files from her work computer, and (c) the alteration of her daughter's transcript to reflect a personal fitness credit must be reversed because the evidence was insufficient to support the decision.

Under the APA,

an administrative agency's findings and conclusions may be reversed by the superior court if they are "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." OCGA § 50-13-19 (h) (5). This language has been interpreted to preclude review if any evidence on the record substantiates the administrative agency's

22

findings of fact and conclusions of law. The presence of conflicting evidence is sufficient to satisfy the any evidence standard.

(Citations and punctuation omitted.) *Alberson*, 273 Ga. App. at 4-5 (1).

(a) *Dual Enrollment Policy*. The ALJ found that there was insufficient evidence to support the Commission's allegation that Quigg was the "mastermind" who orchestrated the one-time change to the School District's dual enrollment policy for the 2009-2010 academic year that made the reporting of college courses dependent on a student's SAT score and whether the student needed the credit from college classes to graduate. However, the ALJ found that Quigg had known that the School District's change to its dual enrollment policy violated the State's Dual Enrollment Regulation but had done nothing about it in her role as superintendent. The ALJ further found that Quigg had allowed the School District to report students as dual enrollment for funding purposes, knowing that their college course grades would not be reported on their transcripts as required by the Dual Enrollment Regulation, and that she took advantage of the temporary policy change to benefit her older daughter "while ignoring her obligation to comply with the law."

Based on these findings, the ALJ concluded that Quigg's conduct pertaining to the dual enrollment issue violated Ethics Code Standard 4, entitled "Honesty,"

23

which provided that "[a]n educator shall exemplify honesty and integrity in the course of professional practice" and further provided that unethical conduct included but was not limited to "falsifying, misrepresenting or omitting . . . information submitted to federal, state, local school districts and other governmental agencies." Ga. Comp. R. & Regs., r. 505-6-.01 (3) (d) (2) (2010).[15] Additionally, the ALJ concluded that Quigg's conduct violated Ethics Code Standard 10, entitled "Professional Conduct," which provided in part that "[a]n educator shall demonstrate conduct that follows generally recognized professional standards and preserves the dignity and integrity of the teaching profession." Ga. Comp. R. & Regs., r. 505-6-.01 (3) (j) (2010).[16] These findings and conclusions were adopted by the Commission as its final decision.

(i) Quigg argues that the Commission's decision must be reversed because there was no evidence that she knew of the one-time change to the School District's dual enrollment policy for the 2009-2010 academic year. Quigg's argument is belied by the record when construed in the light most favorable to the Commission, as our

---

[15] The current version of the Ethics Code contains the same language in Standard 4. See Ga. Comp. R. & Regs., r. 505-6-.01 (3) (d) (2) (2017).

[16] The current version of Standard 10 does not materially differ from the prior version. See Ga. Comp. R. & Regs., r. 505-6-.01 (3) (j) (2017) ("An educator shall demonstrate conduct that follows generally recognized professional standards and preserves the dignity and integrity of the education profession. . . .").

24

standard of review requires. See *Bowman*, 209 Ga. App. at 270 (1). The former director of technology for the School District testified that in 2010, she was in a meeting with Quigg and others in Quigg's office where questions were raised about the validity of the change in the dual enrollment policy, and a decision was made to have the School District curriculum director contact the DOE about the change. After speaking with DOE officials, the curriculum director sent an email on which Quigg was copied in which the director noted that those officials were unaware of any "minimum SAT requirement for a college course to count as high school credit." An assistant principal also sent an email in which he questioned the dual enrollment policy change to the principal of his school, noting that only posting some students' dual enrollment grades on their high school transcripts "may violate our code of ethics" and further noting that dual enrollment students "whose tuition has been paid by the state" through the Accel Program "must have their grades reflected on their high school transcripts." A copy of the response to that email was found on the computer files later retrieved from Quigg that she had removed from her work computer, indicating that she had been aware of the assistant principal's concerns. Furthermore, Quigg herself conceded during questioning by the ALJ that she was made aware of the School District's dual enrollment policy change when her daughter

enrolled in college classes that year, and that she reviewed in "general fashion" the reports sent to the State by the School District in which students were reported as dual enrollment students for funding purposes.

In light of the record construed as a whole, there was evidence to support the ALJ and Commission's finding that Quigg knew of the change to the School District's dual enrollment policy for the 2009-2010 school year and of the questions that had been raised about the validity of the policy change, which violated the clear and unambiguous language of the State's Dual Enrollment Regulation. See Ga. Comp. R. & Regs. r. 160-4-2-.34 (6) (b) (2009); Ga. Comp. R. & Regs. r. 160-4-2-.34 (2) (e) (2010). The evidence further shows that despite that knowledge, Quigg, in her role as local school district superintendent, failed to ensure that the State's Dual Enrollment Regulation was properly enforced in the School District, instead allowing the School District to continue reporting students as dual enrollment for funding purposes and taking advantage of the policy change for the benefit of her own daughter.[17] See generally OCGA § 20-2-109 (a local school superintendent is the

[17] Quigg testified that she did not use her position as superintendent to help her daughters academically, but the ALJ and Commission rejected that testimony as lacking credibility based on an email chain reflecting that when she was superintendent, Quigg would email teachers and principals when she was upset over the grades of one of her daughters. Under the APA, the Commission, rather than the

26

"executive officer of the local board of education" and has the duty "to enforce all regulations and rules of the State School Superintendent and of the local board according to the laws of the state and the rules and regulations made by the local board that are not in conflict with state laws"); *Hall v. Nelson*, 282 Ga. 441, 444 (4) (651 SE2d 72) (2007) (a local school superintendent is the "executive officer" of the school district "who must comply with state law" in carrying out his or her duties). Accordingly, the Commission was authorized to find that Quigg violated Ethics Code Standards 4 and 10 based on her conduct with respect to the dual enrollment policy change.

(ii) Quigg also emphasizes that while the Commission initially charged her with causing the one-year change in the School District's dual enrollment policy, the ALJ and Commission ultimately found that she was not the "mastermind" who orchestrated the change and instead sanctioned her based on evidence that she was aware that the policy violated the State's Dual Enrollment Regulation, did nothing about it in her role as superintendent, allowed the School District to continue reporting students as dual enrollment for funding purposes even when their college

courts, was authorized to evaluate Quigg's credibility and resolve any conflicts in the evidence regarding her role overseeing the education of her children while serving as superintendent. See *Southern Bell*, 254 Ga. at 246.

27

course grades were not posted on their transcripts, and took advantage of the policy change for the benefit of her older daughter. According to Quigg, her due process rights were violated because she was ultimately sanctioned for conduct that varied from the conduct for which she was charged. We disagree.

> [I]n contested cases, such as the present case, the APA provides for a hearing after reasonable notice. See OCGA § 50-13-13 (a) (1). The notice must include "[a] short and plain statement of the matters asserted." OCGA § 50-13-13 (a) (2) (D); see also OCGA § 50-13-18(c)[.] Mere vagaries or generalities are insufficient, and the notice must be sufficiently specific and detailed to convey to the employee the substantial nature of the charge without requiring speculation on [her] part as to the precise complaint [s]he must answer.

(Citations and punctuation omitted.) *Ga. Professional Standards Comm. v. James*, 327 Ga. App. 810, 814 (761 SE2d 366) (2014).

Here, the Statement of Matters Asserted filed by the Commission before the administrative hearing alleged that Quigg used her authority to change the School District's policy on dual enrollment. Of course, necessarily included within that allegation by implication was that Quigg was aware of the policy change. Moreover, the Statement also alleged that Quigg was aware through emails that the dual enrollment policy change violated State regulations, and that the result in the change

28

in policy was that Quigg's older daughter was able to avoid having her dual enrollment grades posted on her high school transcript. The Statement further alleged that Quigg's older daughter was listed as a dual enrollment student on School District reports for funding purposes and that her classes were paid for by the State, even though her college course grades were not posted on her transcript. Given these combined allegations, we conclude Quigg was sufficiently put on notice that she could be sanctioned for the conduct found by the ALJ and Commission in this case. Cf. *Bennett v. State*, 334 Ga. App. 381, 388 (3) (a) (779 SE2d 420) (2015) (indictment in criminal case puts defendant on notice that he can be convicted of the offenses expressly charged in the indictment as well as any lesser included offenses).

(b) *The Confidential Student Files.* The ALJ found that Quigg had removed multiple confidential student files from her work computer without any legitimate reason, and that while there was no evidence that Quigg had misused or improperly disclosed the confidential information, the effect of her actions had been to cause inconvenience for Kornegay, the new superintendent. The ALJ concluded that Quigg's conduct in removing the computer files violated Standard 10 of the Ethics Code, and the Commission adopted the ALJ's findings and conclusions.

Quigg emphasizes that Ethics Code Standard 10 requires evidence that the educator engaged in conduct that does not follow "generally recognized professional standards," Ga. Comp. R. & Regs., r. 505-6-.01 (3) (j) (2010), and she argues that there was no evidence that her removal of the computer files violated such standards. However, Kornegay, the School District's current superintendent, testified that Quigg's removal of the files was "irregular," "unusual," and "strange" from a professional standpoint and was inconsistent with his own professional experience as an educator. Construed in the light most favorable to the decision of the ALJ and Commission, Kornegay's testimony provided some evidence to support a finding that Quigg's removal of the files did not follow generally recognized professional standards.

(c) *Personal Fitness Course Credit.* The ALJ found that after Quigg's role as superintendent had ended and she had moved with her family to Oconee County, she requested that her younger daughter's transcript be altered to show credit for personal fitness, a course that the daughter had not taken, and allowed the altered transcript to be submitted to the Oconee County School District. The ALJ further found that while there was insufficient evidence to support the Commission's allegation that Quigg had created the School District's longstanding practice of allowing students to receive

30

personal fitness credit for taking marching band, there was evidence that Quigg knew that the practice was inconsistent with the State's Personal Fitness Regulation when she requested that her daughter's transcript be altered in the summer of 2011. The ALJ concluded that Quigg's conduct in having her daughter's transcript altered was a violation of Ethics Code Standard 4, and the Commission adopted the findings and conclusions of the ALJ.

Quigg highlights that Ethics Code Standard 4 applies to conduct committed by an educator "in the course of professional practice," Ga. Comp. R. & Regs., r. 505-6-.01 (3) (d) (2) (2010), and she maintains that there was no evidence that she was acting in the course of professional practice when she sought to have her daughter's transcript changed to reflect a personal fitness credit, given that she was no longer superintendent and was retired from the school system. The Commission does not respond to Quigg's argument on this specific point. We agree with Quigg.

"In construing agency regulations, we employ the basic rules of statutory construction and look to the plain meaning of the regulation to determine its meaning." *Walker v. Dept. of Transp.*, 279 Ga. App. 287, 292 (2) (a) (630 SE2d 878)

31

(2006).[18] See *Upper Chattahoochee Riverkeeper v. Forsyth County*, 318 Ga. App. 499, 502 (1) (734 SE2d 242) (2012). The phrase "in the course of" is generally defined as "at some time or times during; in the process or during the progress of." Webster's New International Dictionary 610 (2d ed. 1959) (unabridged). See The Compact Oxford English Dictionary 351 (2d ed. 1991) ("in the course of" means "in the process of, during the progress of"); Webster's New World Dictionary (4th College ed. 2010) ("in the course of" means "in the progress or process of; during"). See also *Couch v. Red Roof Inns*, 291 Ga. 359, 361 (1) (729 SE2d 378) (2012) (consulting dictionary for plain meaning of word). Cf. *Stokes v. Coweta County Bd. of Ed.*, 313 Ga. 505, 508 (722 SE2d 118) (2012) ("in the course of employment" in the context of worker's compensation law means, among other things, "within the period of employment") (citation and punctuation omitted). Hence, we construe the

---

[18] Courts accord considerable weight and deference to an agency's interpretation of its own rules and regulations. See *Welker v. Ga. Dept. of Examiners of Psychologists*, 340 Ga. App. 853, 854 (1) (798 SE2d 368) (2017). But, that rule of deference does not apply in this case because the Commission has not provided an interpretation of the phrase "in the course of professional practice." See, e. g., *Aqua Products v. Matal*, 872 F3d 1290, 1318 (V) (2) (a) (Fed. Cir. 2017) (judicial deference "does not apply where an agency has not actually addressed the issue it purports to be within its discretion to address"); *Northern Air Cargo v. U. S. Postal Svc.*, 674 F3d 852, 860 (III) (D.C. Cir. 2012) (judicial deference does not apply where agency "never actually advanced any interpretation").

phrase "in the course of professional practice" to mean during the time of professional practice of an educator.

In the present case, however, the uncontroverted evidence presented at the administrative hearing shows that Quigg was involved in the alteration of her daughter's transcript to reflect personal fitness course credit *after* she was no longer serving as superintendent and had retired from the School District. Moreover, the ALJ and Commission expressly found that Quigg's efforts to have her daughter's transcript change occurred "[a]fter [Quigg] was removed as Superintendent." Under these circumstances, the ALJ and Commission erred in concluding that Quigg violated Ethics Code Standard 4 with respect to the issue of personal fitness course credit and sanctioning her for that alleged misconduct because Quigg was not acting "in the course of professional practice." Ga. Comp. R. & Regs., r. 505-6-.01 (3) (d) (2) (2010). See generally *Welker*, 340 Ga. App. at 854 (1) (even if there is evidence to support an agency's factual findings, the court also must "examine the soundness of the conclusions of law drawn from the findings of fact supported by any evidence") (citation and punctuation omitted). We therefore reverse the superior court's order to the extent that it affirmed the Commission's decision sanctioning Quigg for violating the Ethics Code based on the revision to her younger daughter's

transcript to reflect personal fitness course credit, and we remand to the superior court for further action consistent with this opinion.

*Judgment affirmed in part, reversed in part, and case remanded with direction.*

*McMillian and Mercier, JJ., concur*.